W. X. HUBER CO., A/C D. A. HOLM, INC., ET AL. *v.* UNITED STATES

**No. 7430.**—Invoices dated Turnstall, England, January 12, 1938, etc.
　　　　Certified January 17, 1938, etc.
　　　　Entered at Los Angeles, Calif., February 18, 1938; New York, N. Y.,
　　　　　April 24, 1941, etc.; and Portland, Oreg., May 3, 1939, etc.
　　　　Entry Nos. 8551; 758117, etc.; 1439, etc.

(Decided November 3, 1947)

*Harper & Harper* (*Abraham Gottfried, Lawrence A. Harper*, and *George R. Tuttle* of counsel) for the plaintiffs.

*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector, William J. Vitale, Dorothy C. Bennett*, and *Daniel I. Auster*, special attorneys), for the defendant.

CLINE, Judge: This case involves 22 appeals for reappraisement covering merchandise exported from England on various dates between October 2, 1937, and March 30, 1941, and entered at the ports of Los Angeles, Portland, Oreg., and New York. The merchandise consists of earthenware glazed tiles in various designs. Except in reappraisement No. 140441–A, it was entered at the invoice values which are claimed to represent export value and was appraised on the basis of foreign value. In reappraisement No. 140441–A, the merchandise was entered under duress at a higher value, and was appraised as entered.

The case was heard originally before Judge Dallinger on December 5, 1941, but objection was made to certain exhibits offered by the Government because the samples mentioned therein were not submitted. Judge Dallinger therefore restored the case to the Los Angeles docket in order that the Government might produce the samples. Subsequently, on agreement of both parties, the case was reopened for all purposes, and considerable additional evidence was submitted both in Los Angeles and in New York.

At the original hearing, it was stipulated that

* * * if the court finds there is no foreign market value, and that export value is the proper basis of appraisement then the invoice value represents the correct dutiable export value.

The principal questions involved, therefore, are whether a foreign market exists for this or similar merchandise, and if not, whether an export value can be found.

Plaintiffs introduced into evidence an affidavit of W. E. Sergeant, commercial and sales manager of the firm of H. & R. Johnson, Ltd., manufacturers of the imported merchandise (exhibit 3). He stated that it was necessary for him to be familiar with the kind and quality of tile bought and sold in Great Britain for home consumption and for export, and that he was personally familiar with the requirements of the markets for which his firm manufactured tile; that H. & R. Johnson, Ltd., offered four grades of tile for home consumption and export to countries other than the United States—Best, Commercial, Seconds, and Thirds; but that the only quality offered and actually sold for export to the United States was Standard Export Quality, described by the witness as follows:

(12) That due to the peculiar demands of the United States market, certain tile, as is hereinbelow more specifically set forth, had to be made specially for said market, which tile could not be sold in Great Britain or for export to other countries; that as a result it was necessary to require that the American purchaser take the *run-of-the-kiln*, excluding only "pitchers" and bad faults which are afterwards broken and not offered for sale; this enables H. & R. Johnson Ltd., to dispose of practically all of the tile manufactured, without the cost of selection, and enables it to offer said tile at the prices reflected in the invoices to Donald A. Holm, Inc.; that this quality is known as Standard Export Quality, and is not offered by any other English manufacturer and is a term of selection not recognized by the Association;

Mr. Sergeant further stated that tile sold to Donald A. Holm, Inc., in 6″ x ½″ dimensions is known as "liners" and is manufactured solely for export to the United States and must necessarily be sold in Standard Export Quality, "that is, the purchaser must take the *run-of-the-kiln*, as it is impossible to utilize any surplus for sale in any of our other markets"; that he had endeavored to promote the sales of such "liners" in other markets, but only a few isolated sales resulted and these were made only in the Best Quality and not in the ordinary course of trade. As to the other types of tile sold to Donald A. Holm, Inc., they were manufactured and sold for home consumption in Great Britain, but not in Standard Export Quality. He explained the differences in the grades of tile sold in the home market as follows: Best is a "superfine selection"; Commercial is a "high selection excluding certain faults, and reasonable consistency in squareness, freedom from warping and even shade and color"; Seconds Quality "is composed of tiles with defects in the course of manufacture such as faults on the face, slightly warped or crooked and approximate in shade," and Thirds Quality is "tile with similar faults as in Seconds Quality but to a more accentuated degree."

Defendant offered in evidence a report of Treasury Representative Percy G. Dwyre, dated February 19, 1938 (collective exhibit 5). It is stated therein that the merchandise sold to the United States consists of 6″ x ½″ borders with fittings therefor; that Mr. Sergeant stated that this size was freely offered for sale for home consumption, but that it was not suitable for the English market; that the only prices quoted in the price list were for Best Quality, but that Standard or Commercial Quality would be approximately 25 per centum lower. The report also states:

The usual quality of border tiles sold in the Home Market is "best", while the quality sold for export to the United States is so-called "Standard" or Commercial. Only the prices for the "Best" quality in these sizes are set forth in the price list. It was stated that if "Standard" or commercial quality were sold in such market the price would be approximately 25% lower.

A later report of Treasury Representative Martin H. Rawlyns, dated March 25, 1939, was also introduced into evidence (collective exhibit 4). As to foreign value, the report states that identical and similar merchandise as that sold for export to the United States is freely offered and sold to all purchasers in the home market; that the merchandise sold to Holm was produced primarily for the United States, and that sales in the home market were infrequent and in small quantities; that 6″ x ½″ border tile was usually sold in Best Quality and only occasionally in the Commercial or run-of-the-kiln Quality. There is attached to this report a price list with the following heading:

U. S. A. PRICE-LIST

PRICES F. O. B. LIVERPOOL

COMMERCIAL QUALITY

Donald A. Holm, secretary-treasurer of Donald A. Holm, Inc., testified that he was familiar with the importations in these cases and that he had seen a considerable portion of them personally; that the merchandise was imported under a grading known as Standard Export Quality, which consists of approximately a kiln run of production, that is, of material as it comes out of the kiln; and that very often there is a good deal of material that is far below any graded tile. He recalled one shipment of about 2,000 pieces all far below standard, which could not have been shipped as any sort of selection of tile. He added that kiln-run merchandise sometimes has a very small percentage of defective tile and sometimes a hundred per centum, but they had to take and pay for it nonetheless; that the tile they sold was sold as Standard Quality tile, but that they had to segregate it very often when a considerable portion was bad, and a lot of it was thrown on the dump heap.

Defendant had introduced into evidence the samples referred to in the Treasury Agents' reports above mentioned, and these were marked exhibits 4–H, 5–A, 5–B, and 5–D. The witness Holm described exhibits 4–H and 5–A as liners, and 5–B as trim sections. Plaintiffs then introduced samples illustrative of the imported tile and these were marked plaintiffs' collective illustrative exhibits 6–A to 6–G. Mr. Holm stated that illustrative exhibit 6–A had an unglazed place which made it ungraded tile; that 6–B had black color spreading into the ellipses, making it subgrade; that 6–C had been fastened onto another tile in the firing; that 6–D had black running through the light color, making it subgrade; that 6–E and 6–F had the surface glaze broken, making them unsalable except as seconds; that 6–G had ragged edges. There were also introduced into evidence as collective exhibits 8–A and 8–B, and exhibit 9, three pieces of tile taken by the examiner from shipments imported at Los Angeles. Witness Holm stated there was nothing wrong with 8–A; that it could appear in a selected quality of tile; that 8–B was pretty good for kiln run but had bad nicks along the edge which disqualified it for a selected tile; that exhibit 9 had a nick on one edge and a deficiency in the glaze but that that might have happened in the handling. Plaintiffs also introduced further illustrative exhibits, marked 10–A to 10–E. Mr. Holm stated that these had large unglazed blobs and were absolutely unusable except for some junk job.

At a subsequent hearing in New York, defendant produced Leo A. Slade, examiner of tiles and glass, who testified that he had received samples out of 10 per centum of the cases of merchandise in the public stores, except in reappraisement numbers 140966–A and 140967–A

where he himself examined 10 per centum. The Government introduced samples from some of the importations and these were marked exhibits 11 to 13, inclusive. They consisted of tiles which the witness had selected and pieces sent to him by the wharf sampler. It appeared that in reappraisement No. 140964–A, there were as many as 18,000 or 20,000 pieces and a sample of two pieces was taken. In picking out the samples, the witness stated that the cases were opened and the pieces laid out on a table and that he then selected a few pieces at random without endeavoring to grade them as to different types. The witness was then shown a book entitled "Modern Wall Tiling" (exhibit 16), put out by H. & R. Johnson, Ltd., and he stated that exhibit 14 was comparable to the design on sheet No. 868, design H. I. P. 815, and that exhibit 13 was comparable to design H. I. P. 846.

Mr. Slade testified further that there is a Standard grade of tile manufactured in this country, which is considered a best quality tile; that the Standard Export Quality, as imported, was equal to the specifications set up for Standard tile in the American market; that the American market has another quality known as Seconds, but that the pieces in these shipments were better than Seconds.

In making his appraisement, Mr. Slade relied upon his judgment and experience, his observation of various qualities of tile, and upon the sample submitted by the special agent of the type of tile sold in the home market.

The defendant then called W. B. Cherry, who was then the New York manager of American-Franklin-Olean Tiles, Inc., and who had been in the tile business for 35 years. He testified that there were two grades of tile in the American market, Standards and Seconds, and that those grades were accepted uniformly throughout the trade and that in a shipment of Standard grade tiles, 5 per centum of inferior grade tiles is allowed. He was then shown exhibit 11 and asked if it was Standard or Second quality. At first he hesitated to pass upon the grade of any tile on the basis of one piece, but later said that the two pieces of tile in the exhibit would be acceptable as Standard grade. He further testified that exhibit 11 was comparable to exhibit 4–H, and that exhibits 12, 13, and 14 were Standard grade. He stated that run-of-the-kiln is not a recognized grade in this country but that it would be necessarily less than Standard.

The defendant also called Charles H. Vanderlaan, proprietor of Vanderlaan Tile Company, agents for domestic factories and importers of tiles. He testified that he had never imported tiles from England other than the Best grade, meaning a grade comparable to Standard quality tile in the United States; that the Commercial grade in England is comparable to the poorest Second quality in the American market; that he did not think any grade other than the Best

English grade would be salable in the United States; that in an importation of the Best tile, there might be a certain percentage of tile not the Best grade and that it might run as high as 10 per centum; that run-of-the-kiln means anything that comes from the kiln without inspection, segregation, or any attempt to divide it for quality; that he knew of no American manufacturer or importer who bought run-of-the-kiln tile. He was shown exhibits 11, 12, 13, and 14 and stated that they were first grade tile and were similar to the tiles in exhibit 4–H, except as to coloring. On cross-examination he stated that the English have a quality which they call the Export Best Quality, but which does not differ in any respect from the Best Quality sold in the home market, although they do make a lower price on it. As to run-of-the-kiln shipments, he testified that in tunnel kilns there might be 85 per centum of quite good quality, and in periodic kilns 60 per centum; that in this country there is no recognized standard of tile known as run-of-the-kiln, but that it would be a different and distinct commercial entity from Standards or Seconds; that in passing upon a shipment, he would have to see a substantial portion of the merchandise.

The case was retransferred to Los Angeles and there were received in evidence exhibits 17 and 18, which consist of contracts made by Donald A. Holm, Inc., and invoices showing deliveries thereunder. The contracts call for H. & R. Johnson's standard grade liners, or standard decorative liners, and the invoices describe the merchandise shipped as liners, angles for liners, angle beads, etc. There was also received in evidence a price list of Donald A. Holm Co., effective February 1, 1934 (exhibit 20). The following statement thereon is pertinent:

GRADING.—The British factories represented by us obviously cannot come under domestic simplified practice rulings, but we have secured their cooperation in standardizing their shipments for this market to a grade fully meeting the qualifications of "Standard Grade" under simplified practice Recommendation, R–16–30. All prices quoted herein are for "Standard Grade."

Plaintiffs claim that no foreign value can be found on the ground that the merchandise exported to the United States was of a different grade or quality from that sold in the home market in England. The affidavit of W. E. Sergeant (exhibit 3) indicates that there are four qualities of tile sold in the English market: Best, Commercial, Seconds, and Thirds. This affidavit and the testimony of Donald A. Holm state that the tiles sold to the United States were of Standard Export Quality, that is, run-of-the-kiln. However, the affidavit of Mr. Sergeant does not differentiate clearly between Commercial and Standard Export Quality, Commercial Quality being described as "a high selection excluding certain faults," and Standard Export Quality as run-of-the-kiln "excluding only 'pitchers' and bad faults." Treasury Representatives Dwyre and Rawlyns, who obtained their

information from Mr. Sergeant, state that the tile sold to the United States was Commercial, Standard, or run-of-the-kiln. Apparently, they found those terms to be synonymous. The United States price list attached to the report of Treasury Representative Rawlyns is for Commercial Quality.

The report of Treasury Representative Rawlyns (collective exhibit 4) contains the following statements:

Identical and similar merchandise to that sold for export to the United States is freely offered for sale and sold to all purchasers in the home market without any restrictions as to use, or control of the re-sale prices. * * *

Mr. Sergeant also stated that the merchandise in question was produced primarily for the United States market, and while it is freely offered and sold to all purchasers in the home market, sales are infrequent and cover small quantities. He added that the merchandise is suitable for the home market, but the demand in such market is for the 6″ x 1″ or wider border tiles.

The 6″ x ½″ border tile and anglebeads and fittings therefor, as sold in the home market, are usually "Best" quality, although occasionally some sales of the "Commercial" or "run of kiln" quality is sold. Only the "Commercial" quality, also called "Standard" quality is sold for export to the United States.

The affidavit of W. E. Sergeant states further that tiles in size 6″ x ½″, known as "liners," have been sold in the home market only in a few isolated instances and then in the Best Quality, and that merchandise similar to the balance of the tile sold to Donald A. Holm, Inc., has been sold for home consumption but not in Standard Export Quality.

Exhibit "E," attached to the report of Treasury Representative Rawlyns, consists of catalogs showing 6″ x ½″ tiles, which catalogs, according to the report, are circulated among all purchasers in the home market. According to a report of Treasury Representative Dwyre (exhibit 5), Mr. Sergeant stated that the 6″ x ½″ tiles were freely offered for sale for home consumption; that they were unsuitable for the English market and were very seldom sold in such market; that the prices given were only for the Best Quality; and that if Standard or Commercial Quality were sold in such market the price would be approximately 25 per centum lower.

An examination of the sales copied from the manufacturer's books by the special agents, discloses sales of merchandise similar to the imported tiles and that such sales were frequently made in the home market. There are many sales of liner tiles in the 6″ x ½″ size in Best and Commercial Quality and any number have the same decoration as the imported tiles.

The testimony of defendant's witnesses, Slade, Cherry, and Vanderlaan, shows that there are but two grades of tile on the American market: Standard and Seconds. Mr. Slade testified that the Standard

Export Quality, as imported, was equal to the American Standard grade, and Mr. Vanderlaan said that the English Best grade was comparable to the American Standard grade, but that the English Commercial grade was inferior.

The statement contained in the price list of Donald A. Holm Co. (exhibit 20), *supra*, indicates that the British tile offered for sale was comparable to tile of the American Standard grade. Moreover, Mr. Holm stated that the merchandise he offered for sale to his customers was a standard grade. A master grade certificate received in evidence as illustrative exhibit 19 defines the American Standard grade as a high grade tile. All of this tends to show that the merchandise shipped from England, whether run-of-the-kiln or not, was of a high quality, comparable to the higher grade tiles sold in the English market.

On this record, I do not think it has been established that the quality of tile sold for export to the United States is dissimilar to that sold in the home market in England. It cannot be held that plaintiffs have overcome the presumption of correctness attaching to the appraiser's finding that the proper dutiable value was foreign value. I find, therefore, that the foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, is the proper basis for the determination of the value of the merchandise here involved and that such values are the appraised values. Judgment will be rendered accordingly.